**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

RENE ANNETTE RICHARDS, individually, and as
proposed executrix of the ESTATE OF ROBERT E.
RICHARDS, deceased,                                          5:17-cv-00178 (BKS/ATB)

                                    Plaintiff,

v.

JOHNSON & JOHNSON, INC., CORDIS
CORPORATION, CONFLUENT MEDICAL
TECHNOLOGIES, INC., and DOES 1–100,

                                    Defendants.

---

**APPEARANCES:**

*For Plaintiff:*
Napoli Shkolnik, PLLC
Nicholas R. Farnolo
400 Broadhollow Road
Melville, NY 11747

*For Defendant Cordis Corporation:*
Goldberg Segalla LLP
John J. Jablonski
665 Main Street
Buffalo, NY 14203
Kenneth M. Alweis
5786 Widewaters Parkway
Syracuse, NY 13214

*For Defendant Confluent Medical Technologies, Inc.:*
McGivney, Kluger & Cook, P.C.
Eric M. Gernant, II
100 Madison Street, Suite 1640
Syracuse, NY 13202

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

In this diversity action against Defendants Johnson & Johnson, Inc. ("J&J"), Cordis Corporation ("Cordis"), Confluent Medical Technologies, Inc. ("Confluent"), and a hundred unidentified persons, Plaintiff Rene Annette Richards, individually and as proposed executrix of the estate of Robert E. Richards, her deceased husband, alleges that Mr. Richards died as a result of a defective medical device designed, manufactured, and sold by Defendants. (*See generally* Dkt. No. 28). The Amended Complaint contains 12 counts, including three strict product liability claims (design defect, failure to warn, and manufacturing defect), a negligence claim, three fraud or fraud-based claims (negligent misrepresentation, fraudulent misrepresentation, and fraudulent concealment), two warranty claims (breach of express warranty and breach of implied warranty), an unfair trade practices claim (violation of N.Y. Gen. Bus. Law §§ 349–350), a derivative loss-of-consortium claim, and a wrongful death claim. (*Id.* ¶¶ 84–210).

Confluent moves to dismiss for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure. (Dkt. No. 33). Cordis moves to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). (Dkt. No. 35). Additionally, Cordis moves to dismiss or strike Plaintiff's request for punitive damages under Rule 12(f). (*Id.*). For the reasons discussed below, Confluent's motion is granted, and Cordis' motion is denied with leave to renew.

## II.    FACTS[1]

On February 3, 2015, a doctor at the Upstate University Hospital in Syracuse, New York, implanted a Cordis TrapEase® inferior vena cava ("IVC") filter in Robert E. Richards, Plaintiff's late husband. (Dkt. No. 28, ¶ 25). Approximately two weeks later, on February 18, 2015, Mr. Richards started complaining of chest pains, with symptoms including nausea, vomiting, coughing, difficulty breathing, weakness, and dizziness. (*Id.* ¶ 26). Mr. Richards and his daughter departed to see his general physician, but Mr. Richards became unresponsive while still in the car. (*Id.*). He was rerouted to the emergency department at Upstate University Hospital, where he was placed on advanced cardiac life support. (*Id.*). Mr. Richards was unable to be revived and he died on February 18, 2015. (*Id.* ¶ 27). The autopsy revealed that the TrapEase filter had migrated to the right ventricle of his heart. (*Id.*).

An IVC filter is a medical device designed to filter or capture blood clots (also known as thrombi) that travel from the lower portions of the body to the heart and lungs. (*Id.* ¶ 30). It is implanted either temporarily or permanently in the inferior vena cava, the vein that returns deoxygenated blood from the lower portions of the body to the heart. (*Id.* ¶¶ 30–31). Individuals at risk for blood clots—referred to as deep-vein thrombi ("DVT") when they develop in the deep leg veins and as pulmonary emboli ("PE") when they reach the lungs—can undergo medical treatment to manage the risk; such treatment may include prescription drugs that regulate the blood's clotting factor, and it may involve the surgical implant of an IVC filter to prevent thromboembolitic events, especially in individuals at high risk for DVT or PE or in individuals who cannot manage their condition with medications. (*Id.* ¶¶ 31–33). Plaintiff, however,

---

[1] The allegations are taken from the Amended Complaint and assumed to be true for purposes of this motion. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

references medical research studies that suggest that IVC filters may not be effective in preventing PE and may actually cause thrombi to occur;[2] these studies have also revealed common failure modes in IVC filters, including migration, perforation, thrombosis, and fracture. (*Id.* ¶¶ 37–41).

The U.S. Food and Drug Administration (the "FDA") has cleared IVC filters for permanent placement to prevent recurrent PE in patients at risk for PE and where anticoagulation has failed or is contraindicated. (*Id.* ¶ 34). Between 2000 and 2003, manufacturers sought to bring IVC filters to market with the added indication of optional retrieval, for uses such as prophylactic prevention of PE in individuals without a prior history of PE. (*Id.* ¶¶ 34–35). On January 10, 2001,[3] the FDA gave "clearance" to Cordis' TrapEase IVC filter under section 510(k) of the Medical Device Amendments to the Food, Drug, and Cosmetic Act[4]—a process less onerous than obtaining "premarket approval" for new medical devices—as a permanent filter substantially equivalent to existing IVC filters.[5] (*Id.* ¶ 42). On September 18, 2002, Defendants[6] sought section 501(k) clearance to market the Cordis' OptEase® filter for the same indicated uses as the TrapEase filter. (*Id.* ¶ 48). Defendants represented that the OptEase filter

---

[2] According to Plaintiff, patients with IVC filter implants "are now routinely managed with lifelong anticoagulation solely to reduce the risk of having the filter in place, subjecting patients to the risks and inconvenience of anticoagulation." (*Id.* ¶ 68).

[3] Plaintiff mentions a different clearance date elsewhere in the Amended Complaint. (*Id.* ¶ 46 ("On July 7, 2000, Defendants obtained clearance through this 510(k) process to begin marketing the Trap Ease filter as a permanent filter.")).

[4] The Amended Complaint states that section 510(k) authorizes "the marketing of medical devices if the device is substantially equivalent to other legally marketed predicate devices without formal review for the safety or efficacy of the device." (*Id.* ¶ 43).

[5] The TrapEase filter is made with Nitinol, a nickel titanium alloy. (*Id.* ¶ 7). It uses a "double basket" design consisting of "a basket made of six diamond-shaped struts proximally and six diamond-shaped struts distally, forming proximal and distal baskets, which are connected by six straight struts to create a single symmetric filter." (*Id.*). The TrapEase filter is anchored using barbs fixed to the vena cava wall. (*Id.*).

[6] In repeated instances, the Amended Complaint refers to Defendants collectively and does not specify which Defendants committed the action alleged. Although, for ease of reference, the Court's recitation of the facts tracks the Amended Complaint, the Court makes no determination on whether Plaintiff's mode of pleading is appropriate.

had the same design as the TrapEase filter's, except that the OptEase had "anchoring barbs for fixation of the filter only on the superior end of each of the six straight struts" and had "a hook at the interior end of the basket to allow retrieval with a snare," whereas the TrapEase filter had "proximal and distal anchoring barbs located on each connecting strut for fixation of the filter to the vena cava wall." (*Id.* ¶ 49). In 2003, the FDA cleared the first IVC filters for a retrieval indication, including J&J's and Cordis' OptEase® filter. (*Id.* ¶ 35).

According to Plaintiff, both the TrapEase and the OptEase filters exhibit design and manufacturing defects—including lack of "[e]lectro polishing," a defective "anchoring mechanism," and a "configuration . . . [that] renders them prothrombotic," (*id.* ¶¶ 51–53)—so that "when exposed to expected and reasonably foreseeable in-vivo conditions," the filters "fracture, tilt, perforate internal organs and vasculature, and lead to the formation of thromboembolism and pulmonary embolism," (*id.* ¶ 50). Recent medical studies have shown that the TrapEase and the OptEase filters fracture at higher rates than other IVC filters. (*Id.* ¶ 60). The Amended Complaint charges that Defendants failed to "establish and maintain an appropriate Quality System in respect to design and risk analysis," "undertake sufficient research and testing to understand the anatomy of where a medical device will be implanted," and "conduct sufficient testing under real world or simulated use conditions." (*Id.* ¶¶ 54–57). Plaintiff further alleges that "Defendants' post-market surveillance system should have revealed that the OptEase filters were unreasonably dangerous," and notes that, "soon after release, Defendants began receiving large numbers of adverse event reports . . . from health care providers reporting" failure of OptEase filters leading to "severe patient injuries" and death. (*Id.* ¶¶ 58–59).

The Amended Complaint asserts that Defendants "failed to take timely and adequate action to correct known design and manufacturing defects" and also "misrepresented and

concealed the risks and benefits of the TrapEase and OptEase filters in labeling and marketing distributed to the FDA, physicians and the public." (*Id.* ¶¶ 62–63; *see also id.* ¶¶ 64–67, 69). On March 29, 2013, Defendants started "a series of recalls"—the initial recall classified by the FDA as a "Class I recall, . . . the most serious type of recall"—because the labeling of the OptEase filter incorrectly "directed physicians to implant the [device] upside down." (*Id.* ¶¶ 70–72).

## III.  DISCUSSION

### A.    Confluent's Rule 12(b)(2) Motion

Confluent moves to dismiss the Amended Complaint for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure. (Dkt. No. 33). As discussed below, Confluent's motion is granted.

### 1.    Standard of Review Under Rule 12(b)(2)

"A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Troma Entm't, Inc. v. Centennial Pictures, Inc.*, 729 F.3d 215, 217 (2d Cir. 2013) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010)). When the issue of personal jurisdiction is "decided initially on the pleadings and without discovery, the plaintiff need show only a prima facie case." *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984). A prima facie showing "must include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996) (alteration in original) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).

"In reviewing a Rule 12(b)(2) motion, 'a court may consider documents beyond the pleadings in determining whether personal jurisdiction exists.'" *SPV OSUS Ltd. v. UBS AG*, 114 F. Supp. 3d 161, 167 (S.D.N.Y. 2015) (quoting *Greatship (India) Ltd. v. Marine Logistics*

*Solutions (Marsol) LLC*, No. 11-cv-420, 2012 WL 204102, at *2, 2012 U.S. Dist. LEXIS 8231, at *5 (S.D.N.Y. Jan. 24, 2012)). Courts must construe the pleadings and affidavits in the light most favorable to the plaintiff and resolve all doubts in the plaintiff's favor. *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). The plaintiff's allegations must provide "factual specificity necessary to confer jurisdiction." *Jazini ex rel. Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998). Conclusory statements, including legal conclusions, not accompanied by supporting facts are insufficient. *Id.*

A court does not err in denying jurisdictional discovery where the plaintiff has failed to make a prima facie case of personal jurisdiction. *Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 18–19 (2d Cir. 2015). Nevertheless, in instances where the plaintiff has shown a "colorable basis for personal jurisdiction," the Court, in its discretion, may order jurisdictional discovery upon concluding that "the plaintiff may be able to establish jurisdiction if given the opportunity to develop a full factual record." *Leon v. Shmukler*, 992 F. Supp. 2d 179, 194 (E.D.N.Y. 2014); *see also Texas Int'l Magnetics, Inc. v. BASF Aktiengesellschaft*, 31 F. App'x 738, 739 (2d Cir. 2002) (explaining that jurisdictional discovery is appropriate when a plaintiff's allegations are "simply insufficiently developed at [the] time to permit judgment as to whether personal jurisdiction is appropriate").

### 2.    Personal Jurisdiction Principles

The Court can exercise personal jurisdiction over a defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed. R. Civ. P. 4(k)(1)(A). "In order to exercise personal jurisdiction over a defendant, a district court must possess a statutory basis for doing so." *Troma*, 729 F.3d at 218. Generally, such a statutory basis "is determined by the law of the state in which the court is located." *Spiegel v. Schulmann*, 604 F.3d 72, 76 (2d Cir. 2010); *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir.

1986) ("Personal jurisdiction over a defendant in a diversity action is determined by the law of the forum in which the court sits."). Thus, the personal jurisdiction analysis here must begin with New York law. The second step of the analysis is to determine whether the exercise of jurisdiction over the defendant is in accordance with constitutional due process. *See Stroud v. Tyson Foods, Inc.*, 91 F. Supp. 3d 381, 385 (E.D.N.Y. 2015).

A "court may exercise two types of personal jurisdiction over a corporate defendant properly served with process": "general" and "specific." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016). General jurisdiction subjects a defendant to suit on any claims, whether or not they arise from the defendant's dealings in the forum state. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). Therefore, a foreign corporation's contacts with the forum must be so "continuous and systematic" that it is "essentially at home" in the forum state. *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014). In *Daimler*, the Supreme Court clarified that the two paradigm bases of general jurisdiction for a corporation are its place of incorporation and its principal place of business, and only "in an exceptional" case would it also be at home in another forum. 134 S. Ct. at 760, 761 n.19. Specific jurisdiction, on the other hand, concerns the exercise of jurisdiction where the claims arise out of the defendant's contacts with the forum. *See Daimler*, 134 S. Ct. at 754. There must be an "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State." *Goodyear*, 564 U.S. at 919 (internal quotation marks and alteration omitted); *accord Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) ("The inquiry whether a forum State may assert specific

jurisdiction over a nonresident defendant "focuses on the relationship among the defendant, the forum, and the litigation." (internal quotation marks omitted)). In this case, Plaintiff is only asserting specific jurisdiction; Plaintiff concedes that it has not alleged that Confluent is "at home" in New York.[7] (Dkt. No. 42, at 12).

### 3. Specific Jurisdiction Under New York Statutory Requirements

Confluent moves to dismiss the Amended Complaint on the ground that it is not amenable to specific jurisdiction in New York under any of the provisions of CPLR 302, New York's long-arm statute. (Dkt. No. 33-1, at 11–14). Plaintiff asserts that specific jurisdiction over Defendants is obtained pursuant to § 302(a)(1) (transaction of business within the state), § 302(a)(2) (commission of a tortious act within the state), and § 302(a)(3) (commission of tortious acts without the state causing injury within the state). (Dkt. No. 42, at 14–21). The Court considers each provision in turn.

### a. Transacting Business – CPLR 302(a)(1)

CPLR 302(a)(1) permits the exercise of jurisdiction over a nondomiciliary when the claim arises from the "transact[ion of] any business within the state or contract[] anywhere to supply goods or services in the state." A finding of jurisdiction under this provision requires a showing that: (1) a defendant "transacts any business" in New York; and (2) the claim "arises from" such transaction. *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007). A defendant transacts business if it is engaged in "some act by which the defendant purposefully avails itself of the privilege of conducting activities within [New York]." *Ehrenfeld v. Bin Mahfouz*, 9 N.Y.3d 501, 508 (2007) (alteration in original) (quoting *McKee Elec. Co. v.*

---

[7] The parties agree that there is not general jurisdiction under *Daimler*, given that Confluent is a Delaware corporation with its principal place of business in California and is not at home in New York. (Dkt. No. 33-1, at 14–16; Dkt. No. 42, at 12).

*Rauland-Borg Corp.*, 20 N.Y.2d 377, 382 (1967)). Such "purposeful availment occurs when the non-domiciliary 'seeks out and initiates contact with New York, solicits business in New York, and establishes a continuing relationship.'" *D&R Glob. Selections, S.L. v. Bodega Olegario Falcon Pineiro*, 29 N.Y.3d 292, 298 (2017) (quoting *Paterno v. Laser Spine Inst.*, 24 N.Y.3d 370, 377 (2014)). At a minimum, the defendant must, on its "own initiative," project itself into the state to engage in a "sustained and substantial transaction of business." *Fischbarg v. Doucet*, 9 N.Y.3d 375, 382 (2007) (quoting *Parke-Bernet Galleries, Inc. v. Franklyn*, 26 N.Y.2d 13, 18 (1970)).

Plaintiff contends that there is purposeful availment by Confluent because "Confluent supplied the component parts to Cordis" and "Confluent would be well aware that these parts were used to create the TrapEase IVC filter, and that those filters would be marketed and sold in New York." (Dkt. No. 42, at 15). Essentially, Plaintiff argues that Confluent transacts business in New York because it "supplies companies that do business within New York." (*Id.*). Confluent replies that "alleged awareness certainly does not amount to purposeful direction." (Dkt. No. 50, at 3). Confluent has proffered an affidavit stating that the company "has never been licensed to do business," "does not engage in any direct solicitation of business," and "does not engage in direct advertisement of goods or services in New York."[8] (Dkt. No. 33-3, ¶¶ 3, 4). As is relevant here, "Confluent sells the component parts [used in the IVC filters] directly to Cordis" but does not sell them in New York. (*Id.* ¶¶ 6, 7).

The Court finds that the indirect chain of contacts alleged by Plaintiff is too tenuous to support transacting-business jurisdiction. The only relevant business conducted by Confluent

---

[8] Confluent acknowledges selling "a small amount of product in New York which is completely unrelated to IVC filters" and which amounts to approximately 0.28% of total revenue over a six-year period. (Dkt. No. 33-3, ¶ 8).

takes place out of state, where Confluent supplies its component parts to Cordis. An out-of-state supplier conducting business with an out-of-state buyer outside of New York does not transact business in New York merely because the buyer happens to do business there. *See Stephan v. Babysport, LLC*, 499 F. Supp. 2d 279, 287 (E.D.N.Y. 2007) (finding no transaction of business in New York by a Texas supplier who sold products to a Texas company that in turn distributed the products to stores across the country, including New York); *see also Copterline Oy v. Sikorsky Aircraft Corp.*, 649 F. Supp. 2d 5, 13 (E.D.N.Y. 2007) (determining that a Connecticut supplier of a helicopter component to a Finnish buyer never purposefully availed itself of the benefits and privileges of doing business under New York law in relation to its sale of the component). Further, mere knowledge by the supplier that the products could end up in New York is not purposeful activity. *See Stephan*, 499 F. Supp. 2d at 287 ("While [the Texas supplier] may have been aware that its products were later distributed by [the Texas distributor] throughout the United States, such knowledge constitutes neither knowledge of the products' ultimate destination nor purposeful availment of the protection of New York law."); *cf. A+E Television Networks, LLC v. Wish Factory Inc.*, No. 15-cv-1189, 2016 WL 8136110, at *8, 2016 U.S. Dist. LEXIS 33361, at *22 (S.D.N.Y. Mar. 11, 2016) (ruling that a company's merchandising activities in New York could not be imputed to a business counterparty that was aware of but did not participate in those activities).

### b.    Tortious Act Within State – CPLR 302(a)(2)

CPLR 302(a)(2), in relevant part, provides for jurisdiction when the claim arises from a defendant's "commi[ssion of] a tortious act within the state." A "defendant's physical presence in New York is a prerequisite to jurisdiction under § 302(a)(2)." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 790 (2d Cir. 1999); *see also Thackurdeen v. Duke Univ.*, 130 F. Supp. 3d 792, 803 (S.D.N.Y. 2015) (remarking that "the Second Circuit continues

to adhere to the traditional, stricter rule . . . requiring the defendant to physically commit the tortious act within New York"), *aff'd*, 660 F. App'x 43 (2d Cir. 2016). Plaintiff argues that, "by manufacturing to specification and selling the nitinol to Cordis, which it knew would be used by Defendant Cordis to assemble the Cordis TrapEase filter," Confluent "committed a tort when the defective TrapEase filter" caused Mr. Richard's death.[9] (Dkt. No. 42, at 17). Plaintiff, however, has not alleged that Confluent manufactured or sold the nitinol to Cordis in New York. Further, Plaintiff has not contradicted Confluent's averment that Confluent manufactured and sold the component parts to Cordis outside of New York. (*See* Dkt. No. 33-3, ¶¶ 6–7). Given that all of Confluent's alleged conduct occurred outside of New York, there can be no personal jurisdiction under § 302(a)(2).[10]

### c.        Injury Within State – CPLR 302(a)(3)

Under CPLR 302(a)(3), a court may exercise specific jurisdiction over a defendant when the action arises from the defendant's "commission of a tortious act without the state causing injury to person or property within the state," as long as the defendant: (i) "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state"; or (ii) "expects or should reasonably expect the act to have consequences in the state and derives substantial

---

[9] Plaintiff seems to conflate the location of the conduct with the location of the injury. (*See* Dkt. No. 42, at 17).

[10] In her opposition brief, Plaintiff asserts that "Confluent and Cordis are seemingly tied together in ways that are deeper than has been let on," quoting a biography of Tom Duerig, Confluent's chief technology officer and founder, stating that he was Confluent's CEO until the company's acquisition by J&J in 1997 and resumed that role after the company's spinout from J&J in 2008, and further that Mr. Duerig was instrumental while at J&J in developing the TrapEase filter within J&J's "Cordis division." (Dkt. No. 42, at 17 n.4). It is unclear whether Plaintiff is advancing the argument that Confluent is Cordis' agent and that Cordis' New York contacts should be imputed to Confluent. The Amended Complaint states that "the Defendant and each of the DOE defendants were the agent, servant, employee and/or joint venture of the other co-defendants." (Dkt. No. 28, ¶ 16). Neither this conclusory allegation of agency nor the fact that Confluent employees may have worked at Cordis seven years before the alleged events is sufficient to establish an agency relationship. Therefore, to the extent Plaintiff advances an agency theory, her argument fails. As for the cases she cites in support of § 302(a)(2) jurisdiction, (Dkt. No. 42, at 16), they are distinguishable on their facts, as noted by Confluent in its reply, (*see* Dkt. No. 50, at 4).

revenue from interstate or international commerce." As discussed above, Confluent does not engage in business, conduct activities, or derive substantial revenue from business in New York. (*See* supra Part III.A.3.b.i). Therefore, insofar as Plaintiff has pled that Confluent acted tortiously outside of New York by supplying allegedly defective component parts to Cordis and that such conduct caused injury to Mr. Richards in New York, the only possible basis for personal jurisdiction over Confluent is under § 302(a)(3)(ii). The inquiry must thus focus on whether: (1) Confluent expected or reasonably expected that its actions would have consequences in New York; and (2) Confluent derives substantial revenue from interstate or international commerce. *See Boyce v. Cycle Spectrum, Inc.*, 303 F.R.D. 182, 184 (E.D.N.Y. 2014).

With respect to the first element, Plaintiff contends that "the consequences for Confluent in New York are foreseeable," and she cites a number of New York cases for the proposition that "where a party manufactures, but then sells to or relies on another to distribute a particular product, that party should expect that its activities might have consequences in New York." (Dkt. No. 43, at 18–19). Further, Plaintiffs argues that "Confluent assuredly knew that its nitinol product was going to be used in a medical device" and "knew that Cordis would market and distribute the TrapEase device nationwide, including in New York." (*Id.* at 19). Confluent maintains that Plaintiff's cases are inapposite because each "deal[s] with a manufacturer of a final product that is sold to a distributor who ultimately sends that product to New York"— whereas Confluent is not a manufacturer of a final product and Cordis is not a distributor (Dkt. No. 50, at 5). The Court agrees that the cases cited by Plaintiff are not precisely on point.[11]

---

[11] Plaintiff mischaracterizes the court's ruling in the first case she cites, *Re v. Breezy Point Lumber Co.*, 118 Misc. 2d 206, 210 (N.Y. Sup. Ct. 1983). The court there did not find that the Japanese parent company was subject to jurisdiction based on foreseeable consequences of its acts in New York; rather, the parent's reasonable expectations were "unclear," and the court ordered an evidentiary hearing to decide the matter. *See id.* Further, the relationship was between a foreign parent company and a wholly owned New York subsidiary that acted as the parent's distributor in the United States—not between a parts supplier and an unaffiliated final product manufacturer. The second case cited by Plaintiff allowed § 302(a)(3)(ii) jurisdiction over an out-of-state product manufacturer because

"The test of whether a defendant expects or should reasonably expect his act to have consequences within the State is an objective rather than subjective one." *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 241 (2d Cir. 1999) (quoting *Allen v. Auto Specialties Mfg. Co.*, 45 A.D.2d 331, 333 (3d Dep't 1974)). In *Kernan*, the Second Circuit noted that New York courts have applied the "reasonable expectation" requirement in a manner consistent with the constitutional due process limits on state jurisdiction. *Kernan*, 175 F.3d at 241. The Court thus cited New York authorities for the proposition that "the simple likelihood or foreseeability 'that a defendant's product will find its way into New York does not satisfy this element, and that purposeful availment of the benefits of the laws of New York such that the defendant may reasonably anticipate being haled into New York court is required.'" *Id.* (quoting *In re DES Cases*, 789 F. Supp. 552, 570–71 (E.D.N.Y. 1992)). Subsequently, however, the Second Circuit acknowledged that the New York Court Appeals, in an intervening case, had not made purposeful availment a part of the § 302(a)(3)(ii) analysis but instead "only a part of [the] constitutional determination." *See Bank Brussels*, 305 F.3d at 127 n.3 (citing *LaMarca v. Pak-Mor Mfg. Co.*, 95 N.Y.2d 210, 214–16 (2000)).

The Court need not determine whether the first element is established because, even assuming that Confluent's awareness of Cordis' sale and distribution strategy was sufficient to establish that Confluent should have expected its conduct to have consequences in New York, the Court finds that Plaintiff has insufficiently pled the second requirement under § 302(a)(3)(ii).

---

its exclusive distributor (which apparently distributed the manufacturer's products in New York) was the manufacturer's agent. *See Banegas v. Five Ctys. Carting Recycling Corp.*, 276 A.D.2d 655, 655 (2000). The Amended Complaint, however, has not alleged a plausible agency relationship between Confluent and Cordis. (*See supra* note 10). In Plaintiff's third case, *Halas v. Dick's Sporting Goods*, 105 A.D.3d 1411, 1412 (4th Dep't 2013), the court ruled that the foreign manufacturer "should have reasonably expected that its negligence would have consequences in individual states, including New York, because its [exclusive] distributor, Dick's Sporting Goods, targets the nationwide market" by selling the manufacturer's products directly to consumers at retail locations. *Id.* at 1411-12. That situation is distinguishable from the present case, which involves a component part supplier which is not involved in the final product manufacturer's distribution efforts. (*See* Dkt. No. 33-2, ¶¶ 2–3).

Citing paragraph 22 of the Amended Complaint, Plaintiff purports to have alleged that "Confluent derived substantial revenue" in New York. (Dkt. No. 42, at 20). But that paragraph concerns the "DOES 1 through 100," not Confluent, and it merely asserts "[u]pon information and belief" that the John Does "derived and continue to derive substantial revenue" from their acts. (Dkt. No. 28, ¶ 22). That conclusory statement does not assert the basis for Plaintiff's "information and belief," nor does it state that Confluent derived substantial revenue from interstate commerce or international commerce.[12] Plaintiff's allegations, therefore, do not provide the factual specificity necessary to confer jurisdiction under § 302(a)(3)(ii). *See, e.g.*, *Deitrick v. Gypsy Guitar Corp.*, No. 16-cv-616, 2016 WL 7494881, at *7, 2016 U.S. Dist. LEXIS 179481, at *18–19 (S.D.N.Y. Dec. 28, 2016) (concluding that the plaintiff's "mere conclusory statement—tracking the language of the required showing—is insufficient to meet his burden" to show that the defendants derived substantial revenue, measured on either a relative or absolute basis, from interstate or international commerce).

### 4.    Constitutional Due Process

Even if New York's long-arm statute applied, the Court would conclude that specific jurisdiction is not permissible under the Due Process Clause. In the first step of the due process analysis, the Court evaluates whether the plaintiff has alleged that the "defendant has 'certain minimum contacts' with the relevant forum." *O'Neill v. Asat Trust Reg.* (*In re Terrorist Attacks on September 11, 2001*), 714 F.3d 659, 673 (2d Cir. 2013) (quoting *International Shoe*, 326 U.S.

---

[12] The Amended Complaint alleges that both Cordis and Confluent have their principal places of business in California, but it does not indicate if Confluent is involved in interstate or international commerce. (Dkt. No. 28, ¶¶ 11–12). The Court notes that the parties have not indicated where Confluent's component parts are designed, manufactured, and sold. Although Plaintiff is not expected to *prove* that Confluent derives substantial revenue from interstate commerce if that "knowledge is peculiarly under the control of the defendant and may come to light in the course of subsequent discovery," *City of New York v. A-1 Jewelry & Pawn, Inc.*, 501 F. Supp. 2d 369, 418 (E.D.N.Y. 2007), Plaintiff must at the very least *allege* this element based on facts in her possession.

at 316). Once minimum contacts are established, the Court inquires as a second step "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable under the circumstances of the particular case." *Metro. Life*, 84 F.3d at 568 (quoting *International Shoe*, 326 U.S. at 316).

### a.    Minimum Contacts

The minimum contacts inquiry "focuses on the relationship among the defendant, the forum, and the litigation." *Walden*, 134 S. Ct. at 1121. To determine if a defendant has sufficient contacts with the forum to justify the Court's exercise of specific jurisdiction, "the defendant's suit-related conduct must create a substantial connection with the forum State." *Id.*; *see also Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1785 (2017) (stating that, for a court to exercise specific jurisdiction over a nonresident defendant, "the defendant must have purposefully avail[ed] itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State" (alteration in original) (internal quotation marks omitted)).

Plaintiff contends that minimum contacts exist because "Confluent sold this specific nitinol metal alloy to Cordis and knew that alloy would be used for the TrapEase IVC filter," and "Confluent also knew that the TrapEase filter would be sold and marketed nationwide, including in New York," where it injured Mr. Richards. (Dkt. No. 42, at 23). Confluent asserts, on the other hand, that it did not purposefully direct its activities toward New York, as it "does not sell the component parts used in the IVC filters in New York," "is not licensed to conduct business in New York," "owns no real property in New York," and "has no TrapEase-related activities in New York, let alone any giving rise to Plaintiff's claims." (Dkt. No. 33-1, at 17). Confluent adds that the "only allegation involving New York is that the harm occurred to Plaintiff in the state." (Dkt. No. 50, at 6).

In *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873 (2011), a majority of Supreme Court Justices—a plurality of four joined by Justices Breyer and Alito concurring in the judgment—concluded that a British machine manufacturer could not be haled into New Jersey courts merely because (1) its independent American distributor had sold and shipped a machine to a New Jersey customer (that eventually injured the customer's employee), (2) the manufacturer desired that the distributor sell its machines "to anyone in America willing to buy them," and (3) representatives of the manufacturer attended trade shows in the United States. *Id.* at 888 (Breyer, J., concurring in the judgment) (describing the facts of the case). The plurality opined that the manufacturer had not "engaged in conduct purposefully directed at New Jersey," *id.* at 887 (Kennedy, J.), whereas the concurrence observed that there was "no 'regular . . . flow' or 'regular course' of sales in New Jersey," no "special state-related design, advertising, advice, [or] marketing" directed at New Jersey, "no specific effort . . . to sell in New Jersey," no purposeful availment of the privilege of conducting activities in New Jersey, nor delivery of goods "in the stream of commerce 'with the expectation that they will be purchased' by New Jersey users," *id.* at 889 (Breyer, J.).

Here, Confluent is in a similar position as the manufacturer in *Nicastro*. Confluent's only alleged contact with New York giving rise to Mr. Richards' injury was the presence in New York of the allegedly defective TrapEase filter marketed by Cordis, which incorporated component parts supplied by Confluent. There is no allegation that Confluent had regular sales in New York, directed its products toward New York, or catered to the New York market. Like the medical device manufacturer in *Tansey v. Cochlear Ltd.*, Confluent "has no significant connections to New York and does not manufacture, sell or distribute its products in New York." No. 13-cv-4628, 2014 WL 4829453, at *4, 2014 U.S. Dist. LEXIS 138250, at *9 (E.D.N.Y. Sept.

26, 2014) (finding no minimum contact between foreign device manufacturer and New York). As a component part supplier, Confluent is even more removed from distribution decisions than the Australian company was in *Tansey*. There, the company's products were "sold and distributed exclusively" by its Colorado-based wholly-owned subsidiary. *Id.* Here, Plaintiff does not even allege that there is a distributorship agreement between Confluent and Cordis. In sum, Plaintiff has failed to allege conduct by Confluent that was purposely directed toward New York.[13]

### b.    Traditional Notions of Fair Play and Substantial Justice

Since Confluent does not have minimum contacts with New York, the Court need not proceed to the second step of the analysis concerning reasonableness. *Metro. Life*, 84 F.3d at 568 ("A reviewing court must first examine the defendant's contacts with the forum. If the same do not exist in sufficient abundance, that is, if the constitutionally necessary first-tier minimum is lacking, the inquiry ends." (quoting *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 465 (1st Cir. 1990))); *see also Bank Brussels*, 305 F.3d at 129 ("The import of the 'reasonableness' inquiry varies inversely with the strength of the 'minimum contacts' showing—a strong (or weak) showing by the plaintiff on 'minimum contacts' reduces (or increases) the weight given to 'reasonableness.'"). Accordingly, the Court concludes that the exercise of personal jurisdiction over Confluent would violate due process, and Confluent's motion to dismiss for lack of personal jurisdiction is granted.

---

[13] Likewise, Plaintiff has not made a prima facie showing of personal jurisdiction under the "effects test." This test is typically invoked when "the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013). In such cases, "the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum." *Id.*; *accord Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87–88 (2d Cir. 2018). Here, there is no suggestion that Confluent "expressly aimed its conduct" at New York.

### 5.    Jurisdictional Discovery

In her opposition, Plaintiff requests jurisdictional discovery in the event the Court deems her allegations insufficient to support personal jurisdiction over Confluent. (Dkt. No. 42, at 21). Confluent counters that its "unopposed affidavit establishes the full extent of Confluent's business transactions with New York." (Dkt. No. 50, at 7). Plaintiff does not identify any potential discovery that would lead to evidence of minimum contacts by Confluent.[14] Therefore, as Plaintiff has failed to "demonstrate that facts supporting personal jurisdiction may exist that discovery should draw out," there is no basis for allowing jurisdictional discovery on this matter. *PST Servs., Inc. v. Larson*, 221 F.R.D. 33, 37 (N.D.N.Y. 2004). Accordingly, Plaintiff's request for additional discovery is denied.

### B.    Cordis' Motion

Cordis moves to dismiss the Amended Complaint on the grounds that Plaintiff lacks capacity to assert her claims and otherwise fails to state a claim. (Dkt. Nos. 35, 35-1). Cordis also moves to dismiss or strike Plaintiff's request for punitive damages under Rule 12(f). (*Id.*). As discussed below, the motion is denied with leave to renew.

### 1.    Procedural Posture

The Amended Complaint asserts 12 counts. (Dkt. No. 28, ¶¶ 84–210). Plaintiff purports to sue both "individually" and as "Proposed Executrix of the Estate" of Mr. Richards. (Dkt. No. 28, at 1). Defendant argues that none of these counts are claims that she can assert individually—a point that Plaintiff does not refute in her opposition. The first 10 counts describe "survival" claims that Mr. Richards possessed at the time of his death.[15] (Dkt. No. 28, ¶¶ 84–

---

[14] As explained above, *see supra* note 10, Plaintiff provides no basis for speculating that discovery could reveal an agency relationship between Confluent and Cordis.

[15] These survival claims (Counts I through X), which arise out of injuries suffered by the decedent, are: (1) design defect; (2) failure to warn; (3) manufacturing defect; (4) negligence; (5) negligent misrepresentation; (6) fraudulent

202). By statute, such claims survive the decedent's death to permit recovery by the decedent's estate. *Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176, 183 (2d Cir. 2002) (describing survival claims as "claims for pre-death injuries to a decedent's person or property" (citing N.Y. Est. Powers & Trusts Law § 11-3.2)); *Antoine v. State*, 103 Misc. 2d 664, 668 (N.Y. Ct. Cl. 1980) ("At common law, all actions arising ex delicto died with the person by whom or to whom the wrong was done. The survival of the cause of action for personal injuries which may be brought by the decedent's personal representative is permissible by statute." (citation omitted)). Plaintiff also brings a wrongful death claim (Count XII), (Dkt. No. 28, ¶¶ 206–210), a cause of action created by statute for the benefit of the estate's distributees, N.Y. Est. Powers & Trusts Law § 5-4.1. Lastly, Plaintiff asserts a separate count for loss of consortium (Count XI), (*id.* ¶¶ 203–205), but as Cordis correctly notes, loss of consortium is a derivative claim that rises and falls with a decedent's survival claims and cannot be predicated on a wrongful death claim. *See Liff v. Schildkrout*, 49 N.Y.2d 622, 633–34 (1980) (declining "to recognize a common-law cause of action on behalf of the surviving spouse for permanent loss of consortium due to the wrongful death of his or her marital partner," and further holding that loss of consortium cannot be "claimed as an element of damages within a wrongful death action").

Cordis argues that Plaintiff lacks capacity to bring her survival and wrongful death claims because she is not a "personal representative" authorized to represent the decedent's estate and distributees under New York law.[16] (*See* Dkt. No. 35-1, at 12–13). Lack of capacity to sue is a

---

misrepresentation; (7) fraudulent concealment; (8) breach of express warranty; (9) breach of implied warranty; and (10) violations of N.Y. Gen. Bus. Law §§ 349 and 350. (Dkt. No. 28, ¶¶ 84–202).

[16] Although Cordis has also described this as a lack of "standing," (Dkt. No. 51, at 2-3), the "two legal doctrines are not interchangeable." *Cmty. Bd. 7 v. Schaffer*, 84 N.Y.2d 148, 154 (1994). Standing is a jurisdictional requirement, which the plaintiff bears the burden to establish. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). As the New York Court of Appeals explained:

> "Standing" is an element of the larger question of "justiciability." . . . "Capacity," in contrast, concerns a litigant's power to appear and bring its grievance before the court. The concept of a lack

waivable affirmative defense that is raised "by a specific denial, which must state any supporting facts that are peculiarly within the party's knowledge." Fed. R. Civ. P. 9(a); *see Wiwa v. Royal Dutch Petroleum Co.*, No. 01-cv-1909, 2009 WL 464946, at *4, 2009 U.S. Dist. LEXIS 14883, at *20 (S.D.N.Y. Feb. 25, 2009). Generally, "a pleading need not allege . . . a party's authority to sue . . . in a representative capacity." Fed. R. Civ. P. 9(1)(B). However, if a lack-of-capacity objection is made and it is clear on the face of the complaint that the plaintiff lacks capacity to sue, dismissal under Rule 12(b)(6) is appropriate. *Machne Menachem, Inc. v. Hershkop*, No. 97-cv-2550, 2001 WL 984943, at *3, 2001 U.S. Dist. LEXIS 12172, at *8 (E.D.N.Y. July 24, 2001) ("Courts in this Circuit have held that where a defect appears on the face of the complaint, a motion under Rule 12(b)(6) is the appropriate means for asserting a lack of capacity to sue."); *see also Estate of Vaiselberg ex rel. Vaiselberg v. Snow*, No. 02-cv-6235, 2003 WL 1878248, at *1, 2003 U.S. Dist. LEXIS 6166, at *2 (S.D.N.Y. Apr. 14, 2003) ("The motion is granted pursuant to Rule 12(b)(6), for the complaint and an attachment thereto plainly show that Vaiselberg lacks capacity to bring this action on behalf of his mother's estate.").

## 2.    Standard of Review Under Rule 12(b)(6)

To survive a pre-answer motion to dismiss for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements

---

of capacity, which has also occasionally been intermingled with the analytically distinct concept of a failure to state a cause of action, does not admit of precise or comprehensive definition. Capacity, or the lack thereof, sometimes depends purely upon a litigant's status.

*Cmty. Bd. 7 v. Schaffer*, 84 N.Y.2d 148, 154–155 (1994) (citations omitted). Here, Cordis' challenge is in the nature of a defense for lack of capacity to sue, not jurisdictional standing. Accordingly, the Court has reviewed Cordis' lack-of-capacity defense under Rule 12(b)(6).

of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140, at *5 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). When deciding a motion to dismiss, the Court's review is ordinarily limited to "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court may also consider "any document not incorporated but that is, nevertheless, 'integral' to the complaint because the complaint 'relies heavily upon its terms and effect.'" *See Yung v. Lee*, 432 F.3d 142, 146 (2d Cir. 2005) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).

### 3.    Analysis

Federal law provides that capacity to sue for individuals acting in a representative capacity is determined "by the law of the state where the court is located." Fed. R. Civ. P. 17(b)(3). Therefore, the Court must determine whether Plaintiff has representative capacity to sue under New York law.

In both survival and wrongful death actions, capacity to sue is vested in the decedent's "personal representative." *See* N.Y. Est. Powers & Trusts Law § 11-3.2 (stating that, with regard to a decedent's claims for "injury to person or property . . . an action may be brought or continued by the personal representative of the decedent"); *id.* § 5-4.1 (providing that the "personal representative . . . of a decedent who is survived by distributees may maintain an action to recover damages for a wrongful act, neglect or default which caused the decedent's

death"). The personal representative brings survival claims on behalf of the estate and wrongful death claims on behalf of distributees.[17] *See* Margaret Valentine Turano, *Practice Commentaries*, McKinney's Cons. Laws of N.Y., Book 17B, N.Y. Est. Powers & Trusts Law § 5-4.1 (explaining that the wrongful death "cause of action belongs to . . . distributees, unlike the action for personal injury, which belongs to the decedent's estate" (citation omitted)). A personal representative is "a person who has received letters to administer the estate of a decedent." N.Y. Est. Powers & Trusts Law § 1-2.13. An "executor" is one such type of personal representative: the term is defined as a "person to whom letters testamentary have been issued." N.Y. Surr. Ct. Proc. Act § 103(20). Such letters must be issued by a court. *See id.* § 701(1); *see* also Margaret Valentine Turano, *Practice Commentaries*, McKinney's Cons. Laws of N.Y., Book 58A, N.Y. Surr. Ct. Proc. Act § 701 ("[E]xecutors . . . cannot act until a court issues them letters.").

"A person who undertakes to settle the estate of the decedent without the formality of court administration is known as a 'voluntary administrator' and does not have the power to enforce a claim for the wrongful death or personal injuries of a decedent." *Cherry v. Hillside Manor Rehab. & Extended Care*, No. 06-cv-3296, 2008 WL 2559378, at *5, 2008 U.S. Dist. LEXIS 48235, at *17–18 (E.D.N.Y. June 23, 2008); *accord Schoeps v. Museum of Modern Art*, 594 F. Supp. 2d 461, 466 (S.D.N.Y. 2009) ("[U]nder New York law, a cause of action possessed by the decedent at the time of his or her death may be brought subsequently by a representative of the decedent only if the plaintiff has been appointed personal representative of the decedent's estate by the New York Surrogate."); *Estate of DiGiacomo v. Lentz*, No. 03-cv-6724, 2004 WL 66690, at *1, 2004 U.S. Dist. LEXIS 412, at *2 (S.D.N.Y. Jan. 14, 2004) ("Under New York

---

[17] The personal representative is not only the exclusive representative of the estate for survival claims and of distributees for wrongful death claims, but she is also the only person vested with the substantive right of action on those claims. *See In re Sept. 11 Litig.*, 760 F. Supp. 2d 433, 444 (S.D.N.Y. 2011).

law, an estate without a personal representative is not an entity that can bring a wrongful death claim or a survival claim."); *see also* N.Y. Surr. Ct. Proc. Act § 1306(3) (providing that a "voluntary administrator shall have no power to enforce a claim for the wrongful death of or a claim for personal injuries to the decedent"). Consequently, a plaintiff's failure to obtain the requisite letters means that the plaintiff is not a personal representative and thus lacks capacity to bring survival and wrongful death claims.

The Amended Complaint makes multiple references to Plaintiff as the "proposed executrix" of Mr. Richards' estate, a title also used in the caption. (*See generally* Dkt. No. 28).[18] In response to Cordis' challenge to her capacity, Plaintiff explains that she is the "sole executrix of this estate as per decedent's Last Will and Testament." (Dkt. No. 43, at 12–13). But she does not assert that she was issued letters testamentary. *See Genao v. United States*, No. 08-cv-878, 2010 WL 3328017, at *3–4, 2010 U.S. Dist. LEXIS 86079, at *9 (E.D.N.Y. Aug. 19, 2010) (noting that "a will alone cannot authorize the plaintiff to file suit without a formal appointment by a New York court"). Without letters testamentary, Plaintiff lacks capacity to bring her claims.[19] *See Vaiselberg*, 2003 WL 1878248, at *1, 2003 U.S. Dist. LEXIS 6166, at *2 (dismissing plaintiff's claim for lack of capacity because she was "not a 'personal representative' who has received letters to administer his mother's estate").

Nevertheless, Plaintiff argues that "the express language of Fed. R. Civ. P. 17(a)(3) preclud[es] dismissal in the absence of a valid real party in interest" and a reasonable time to permit that party's ratification, joinder, or substitution. (Dkt. No. 43, at 13). Rule 17(a) requires

---

[18] Plaintiff identified herself in the caption and text of her original Complaint as "administrator of the estate." (Dkt. No. 1, at 1). Following Cordis' initial motion to dismiss, which also challenged her capacity to bring this action, (Dkt. No. 8-1, at 11–13), Plaintiff filed the Amended Complaint, identifying herself as the "proposed executrix."

[19] Having concluded that Plaintiff failed to sufficiently allege capacity to bring this action against Cordis, the Court reaches neither Cordis' argument that the Amended Complaint otherwise fails to state a claim for relief, nor Cordis' motion to strike Plaintiff's request for punitive damages.

that an action "be prosecuted in the name of the real party in interest."[20] Fed. R. Civ. P. 17(a). A

real party in interest is "the person who, according to the governing substantive law, is entitled to

enforce the right." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 193 (2d Cir. 2003)

(quoting 6A Wright & Miller § 1543); *see also Stichting Ter Behartiging Van De Belangen Van*

*Oudaandeelhouders in Het Kapitaal Van Saybolt International B.V. v. Schreiber*, 407 F.3d 34,

49 n.7 (2d Cir. 2005) (clarifying that Rule 17(a), albeit procedural, looks to "state law regarding

who holds the substantive right of action"). "[T]he modern function of the rule . . . is simply to

protect the defendant against a subsequent action by the party actually entitled to recover, and to

insure generally that the judgment will have its proper effect as res judicata." Fed. R. Civ. P. 17

advisory committee's note to 1966 amendment. Under Rule 17(a)(3), a "court may not dismiss

an action for failure to prosecute in the name of the real party in interest until, after an objection,

a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted

into the action." Cordis argues that the rule does not apply in these circumstances because

Plaintiff "does not suggest any mistake in selecting the proper plaintiff, or that further time is

needed to find such an individual." (Dkt. No. 51, at 3). As Cordis points out, Plaintiff continues

to maintain that she "is a real party in interest under federal and New York law." (Dkt. No. 43, at

---

[20] The requirement of a real party in interest is distinct from the capacity requirement. A leading treatise explains:

> As used in Rule 17(a), the real-party-in-interest principle is a means to identify the person who
> possesses the right sought to be enforced. Therefore, the term directs attention to whether plaintiff
> has a significant interest in the particular action plaintiff has instituted, and Rule 17(a) is limited to
> plaintiffs. By way of contrast, capacity is conceived to be a party's personal right to litigate in a
> federal court. The issue is determined under Rule 17(b) and Rule 17(c) for all parties to the suit and
> is neither limited to plaintiffs, nor dependent on the character of the specific claim involved in the
> litigation. Thus it is possible to be the real party in interest and yet lack capacity to sue because a
> person has become mentally incompetent or is an infant. Conversely, a person may have capacity
> to sue under Rule 17(b), but if the person has assigned all interest in the claim before the action is
> instituted, the person no longer is the real party in interest.

6A Charles Alan Wright et al., Federal Practice and Procedure § 1542 (3d ed.) (hereinafter, "Wright & Miller")
(footnotes omitted).

14). She appears to do so, however, under the misunderstanding that she can pursue this action because the decedent appointed her as the executrix in his will.

There is no doubt that Mr. Richards' personal representative, who New York law vests with the right to bring survival claims for the estate and a wrongful death claim for the estate's distributees, could prosecute this action under Rule 17(a). *See* Fed. R. Civ. P. 17(a)(1) (listing executors and administrators as individuals who "may sue in their own names without joining the person for whose benefit the action is brought"). If Plaintiff had letters to administer the estate when she commenced this action, she would be a real party in interest, and Rule 17(a)(3) would not apply; but because of the aforementioned pleading deficiencies, the Amended Complaint would have to be dismissed, with leave to amend. On the other hand, because a plaintiff's status as a personal representative of the estate is a condition precedent to bringing survival and wrongful death claims under New York law, if letters to administer the estate were issued after the commencement of this action or if no such letters have been issued since (to Plaintiff or any other person), Plaintiff would not be the proper party to commence and prosecute this action.[21] In that scenario, Plaintiff could seek leave under Rule 17(a)(3) to have the personal representative ratify, join, or be substituted into the action. It is unclear at this juncture whether a personal representative has been appointed for Mr. Richards' estate. Accordingly, Plaintiff is granted leave to file, by April 9, 2018, a letter clarifying whether the Amended Complaint should be dismissed, with leave to amend, for the aforementioned pleading defects or what relief she

---

[21] *See Wiwa*, 2009 WL 464946, at *7 & n.28, *8 & n.29, 2009 U.S. Dist. LEXIS 14883, at *34, *35 & n.28, *36, *37 & n.29; *Carrick v. Cent. Gen. Hosp.*, 51 N.Y.2d 242, 250 n.2 (1980) (noting that "the existence of a qualified administrator" cannot be reduced to "a mere question of capacity to sue" but is also "essential to the maintenance of the action," and that "the statutory right to recover for wrongful death does not even arise until an administrator has been named through the issuance of letters of administration").

seeks, if any, under Rule 17(a)(3). Cordis may respond to Plaintiff's letter by April 19, 2018. In the meantime, the Court denies Cordis' motion to dismiss with leave to renew.

## IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant Confluent's motion to dismiss (Dkt. No. 33) is **GRANTED** in its entirety, and the Amended Complaint (Dkt. No. 28) is **DISMISSED without prejudice** as to Defendant Confluent for lack of personal jurisdiction; and it is further

**ORDERED** that Defendant Cordis' motion to dismiss (Dkt. No. 35) is **DENIED with leave to renew** in accordance with this Memorandum-Decision and Order; and it is further

**ORDERED** that Plaintiff is granted leave to file, no later than April 9, 2018, a clarification letter in accordance with this Memorandum-Decision and Order; and it is further

**ORDERED** that Cordis may file a response to Plaintiff's letter no later than April 19, 2018.

**IT IS SO ORDERED**.

Dated: March 30, 2018
Syracuse, New York

Brenda K. Sannes
U.S. District Judge